Frank INCARVITE, Appellant,

v.

COMMONWEALTH of Pennsylvania, DEPARTMENT OF TRANSPORTATION, BUREAU OF DRIVER LICENSING.

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 30, 1999.
Decided June 23, 1999.

F. Emmett Fitzpatrick, Philadelphia, for appellant.

Marc A. Werlinsky, Asst. Counsel, and Timothy P. Wile, Asst. Counsel In-Charge, Harrisburg, for appellee.

Before COLINS, President Judge, FLAHERTY, J., and NARICK, Senior Judge.

COLINS, President Judge.

Frank Incarvite (Incarvite) appeals from an order of the Court of Common Pleas of Philadelphia County (trial court), which denied Incarvite's appeal from a one-year suspension of his operating privilege, imposed by the Pennsylvania Department of Transportation (DOT), pursuant to Section 1547(b)(1) of the Vehicle Code, 75 Pa.C.S. § 1547(b)(1).[1]

The following facts gave rise to Incarvite's appeal. On April 16, 1998, Sergeant Alexander Blair was called to investigate an individual who had passed out on the floor of a Boston Market store, next to a puddle of vomit. The individual was identified as Frank Incarvite, an off-duty police officer. Officer Blair called for a rescue squad, which revived Incarvite; the latter then refused further treatment or assistance from the attending paramedics.

Officer Blair stated that he smelled alcohol on Incarvite's breath, and that subsequent to Incarvite's revival by the rescue squad, he observed that Incarvite's speech was slurred and that he needed help to walk. Thereafter, Incarvite went to sit inside his car, but Officer Blair told him, "You're going to have to get out of the car. You're too drunk to drive." Incarvite responded, "I drove here like this and I could drive home like this." At this juncture, Officer Blair stated that he noticed a forty-five caliber glock automatic in Incarvite's car. After taking possession of the gun, Officer Blair managed to get Incarvite out of the car and told him he was under arrest. While waiting for the police wagon, Incarvite got back inside his car, locked the doors, and nodded off behind the wheel. When the police wagon arrived, the officers unlocked the door, and after a brief struggle, Incarvite was handcuffed and placed in the rear of the police wagon.

A second police officer, Lieutenant Thomas Godlewski, testified that he was assigned to the accident investigation unit on April 16, 1998, when he received a call advising him of the arrest of an off-duty police officer (Incarvite). Lieutenant Godlewski explained that when a police officer is suspected of driving under the influence, a supervisor, such as himself, administers the breath analysis test. Lieutenant Godlewski further stated that he explained to Incarvite why he was there, that Incarvite asked if he was entitled to a lawyer, and that he informed Incarvite he was not. Lieutenant Godlewski also stated that a strong odor of alcohol emanated from Incarvite, that the latter's eyes were bloodshot and his speech slurred, and that Incarvite's clothes were in disarray.

■ The record indicates that Incarvite was asked by Lieutenant Godlewski to submit to a chemical test, but refused, and

---

1. 75 Pa.C.S. § 1547(b)(1) provides in pertinent part:

    **(b) Suspension for refusal.-**

      (1) If any person placed under arrest for a violation of section 3731 (relating to driving under influence of alcohol or controlled substance) is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted but upon notice by the police officer, the department shall suspend the operating privilege of the person for a period of 12 months.

that Lieutenant Godlewski read Incarvite the requisite warnings and asked him to sign the form, which Incarvite also refused to do. Accordingly, the trial court denied Incarvite's petition, and this appeal followed.[2]

■■■ On appeal, Incarvite argues that the arresting officer lacked reasonable grounds to believe that he was operating a motor vehicle while under the influence of alcohol, and that the Commonwealth failed to establish that he refused to take the chemical test. Upon reviewing the record, we find little merit in either of these arguments. With regard to Incarvite's "reasonable grounds" argument, this Court, in *DiPaolo v. Department of Transportation, Bureau of Driver Licensing*, 700 A.2d 569 (Pa.Cmwlth.1997), clarified the "reasonable grounds" test set forth in *Department of Transportation, Bureau of Traffic Safety v. Dreisbach*, 26 Pa.Cmwlth. 201, 363 A.2d 870, 872 (1976).

> For 'reasonable grounds' to exist, the police officer obviously need not be correct in his belief that the motorist had been driving while intoxicated. We are dealing here with the authority to request a person to submit to a chemical test and not with the admission into evidence of the result of such a test. The only valid inquiry on this issue at the de novo hearing is whether, viewing the facts and circumstances as they appeared at the time, a reasonable person in the position of the police officer could have concluded that the motorist was operating the vehicle and under the influence of intoxicating liquor.

363 A.2d at 872 (footnotes omitted). The Court in *DiPaolo* went on to state, "[i]t is not necessary for a motorist to fail a field sobriety test in order for a police officer to have reasonable grounds. Furthermore, questions of credibility and the resolution of conflicts in the evidence presented are

determined by the trial court, and if there is competent evidence in the record to support those findings, we may not disturb the fact finder's decision." 700 A.2d at 572 (citation omitted). In the present matter, at Incarvite's hearing before the trial court (N.T. 10/30/98, pp 4–5), Officer Blair — who noted that in 1990 he and Incarvite had been involved in an argument on the highway, but that since then, he had not seen Incarvite until the present incident — testified as follows:

> Blair: When I walked in the restaurant, I saw the gentleman sitting over there (indicating [Incarvite].) He was like passed out on the floor with a puddle of vomit laying next to him.... Beside the fact that there was vomit on the floor, I could smell alcohol on his breath.... [Subsequent to Incarvite's revival by paramedics,] He was staggering. In fact, the fireman had to help him [Incarvite] walk. They were holding him up for a while. You know, his speech was slurred.

Officer Blair's testimony regarding his observations of Incarvite's physical condition and Incarvite's admission that he had driven to the store and could drive home, corroborated by Lieutenant Godlewski's testimony, was found by the trial court to be credible; it constituted reasonable grounds for the officers' belief that Incarvite was under the influence and physically unfit to drive and that he was operating a motor vehicle while under the influence.

Incarvite also contends that the trial court erred in finding that he had made a "knowing and conscious refusal to submit to chemical testing," and avers that the record indicates confusion on his part, since he asked to see a representative of the Fraternal Order of Police (F.O.P.) before consenting to the test, a request he believed he was entitled to make under the F.O.P. collective bargaining contract.

---

**2.** Our scope of review is limited to determining whether findings of fact are supported by competent evidence, and whether the trial court committed an error of law or an abuse

of discretion. *Department of Transportation, Bureau of Driver Licensing v. Scott*, 546 Pa. 241, 684 A.2d 539 (1996).

With regard to the foregoing issue, the following testimony of Lieutenant Godlewski, found credible by the trial court, is relevant:

[Direct Examination]

Q. Did you ask Mr. Incarvite to perform or submit to a chemical analysis of his breath?

A. Yes, I did.

Q. And what was his response to your request?

A. Initially he wanted to know if he was entitled to a lawyer. I said no. And he eventually refused to submit to that testing.

. . . .

Q. There's a section on this document in the center of the page under a heading marked Section 1547, chemical test warning. There's four paragraphs there. Did you read those warnings to Mr. Incarvite?

A. Yes, I did.

. . . .

Q. Did you ask Mr. Incarvite to sign that form to indicate that he had been read those warnings?

A. Yes, I did.

Q. Did he sign the form?

A. He refused to sign the form.

. . . .

Q. Did he indicate to you that he was ill in any other way beside that scrape on his head?

A. No, he didn't.

Q. Did he request any medical attention at that time?

A. No. His only concern was that he wanted a lawyer, and I said you're not entitled to a lawyer at this time.

[Cross–Examination]

Q. Did he [Incarvite] also ask for an F.O.P. representative?

A. He may have. I don't recall . . . .

Q. Was he entitled, Sir, under the contract that the City of Philadelphia has with the F.O.P. to an F.O.P. representative before he underwent any test or submitted to any sort of questioning at all? . . .

A. I'm not sure what the contract states.

█  In the present case, the fact that Incarvite asked for a lawyer and/or an F.O.P. representative prior to submitting to chemical testing is not *per se* tantamount to an expression of confusion about the chemical testing requirement. Moreover, in *Department of Transportation, Bureau of Driver Licensing v. Scott,* 546 Pa. 241, 255, 684 A.2d 539, 546 (1996), our Supreme Court stated, "once an officer provides *O'Connell* warnings to a motorist, the officer has done all that is legally required to ensure that the motorist has been fully advised of the consequences of refusing to submit to chemical testing."

Accordingly, based upon the foregoing discussion, the trial court's decision sustaining DOT's suspension of Incarvite's license is affirmed.

### O R D E R

**AND NOW,** this 23rd day of June, 1999, the order of the Court of Common Pleas of Philadelphia County in the above-captioned matter is hereby affirmed.